STATE OF LOUISIANA IN THE INTEREST OF H.H. and J.J.H.
Nos. 2009 CJ 0073, 2009 CW 0955
Court of Appeals of Louisiana, First Circuit.
October 27, 2009.
Not Designated for Publication
WALTER REED, District Attorney, By: JOHN ALMERICO, Public Defender, Counsel for Appellee State of Louisiana
JOHN BRAUD, BRENDA BRAUD Counsel for Defendant/1st Appellant A.H.K.
WAYNE AUFRECHT, Counsel for Defendant/2nd Appellant J.H.
Before: DOWNING, GAIDRY, and McCLENDON, JJ.
McCLENDON, J.
A.H.K., a mother whose two minor children were taken into state custody and who stipulated that the children were in need of care, appeals a juvenile court's judgment following a final disposition hearing that granted her and the father, J.H., joint custody of the minor children. Additionally, A.H.K. challenges the judgment to the extent that it precludes C.K., the mother's then boyfriend who allegedly sexually abused the children, and J.K., C.K.'s mother, from having any contact with the children. Subsequent to the juvenile court's rendition of judgment, the children's father died. For the following reasons, we affirm the juvenile court's judgment, but remand this matter to the juvenile court to consider its custody ruling in light of the father's death.

FACTUAL AND PROCEDURAL HISTORY
A.H.K. and J.H. were married in 2000, and three children, B.H, H.H. and J.J.H, were born during the marriage. The oldest child, B.H., later died of natural causes while in the care of C.K.'s mother. J.H., the children's father, and A.H.K. physically separated in 2005. They divorced on February 16, 2007. The divorce judgment granted domiciliary custody of the children to the mother and provided the father supervised visitation.
On April 21, 2007, while visiting with their father, H.H. and J.J.H. ("the children"), twins who were then three years old, reported that C.K., their mother's boyfriend, had "kiss[ed] their private parts." J.H. documented the disclosures by video-taping his children's statements.
On May 4, 2007, while visiting with his father, J.J.H. spoke with his mother on the telephone and told her that C.K. "kissed me on my wee-wee." After returning to their mother's home, J.J.H. reiterated what he told his mother on the telephone. Additionally, H.H. reported that C.K. had "kissed me on my coo-coo." A.H.K. believed that the children had been coached by their father insofar as after they told her about the allegations, she indicated the children said, "daddy teached them that."
On May 7, 2007, A.H.K. contacted attorney Mark James, who informed her that her children should be treated by a therapist. A.H.K. contacted her employee assistance program (EAP) and requested a referral to a professional for family counseling. EAP provided A.H.K. a list of social workers and other professionals, including Lisa Tadlock, a licensed clinical social worker. EAP personnel also informed A.H.K. that they were mandatory reporters and that they would notify the Office of Community Services (OCS) of a case of suspected child abuse. After the allegations surfaced, C.K. moved out of the home where he had been staying with A.H.K. in order to get "rid of whatever problems there possibly could be."
A.H.K. subsequently scheduled an appointment with Tadlock for May 16, 2007. Tadlock noted that the children disclosed allegations of sexual abuse and were able to model sexual interactions on dolls, but they were inconsistent with their identifications of the perpetrator, and it was unclear whether they were referring to their biological father J.H. or whether they were referring to C.K. Moreover, Tadlock noted that A.H.K. appeared to be more concerned with getting C.K. to come home than with the sexual abuse of her children. Despite the allegations surrounding C.K., A.H.K. married C.K. on May 19, 2007.
On June 15, 2007, OCS had C.K. submit to what it alleged was a "voice stress test" performed by Detective David Miller of the Bogalusa Police Department. Miller admitted that the records of the test were not kept because they are inadmissible in court, and noted that they are utilized only as an investigative tool. After completing the "voice stress test," C.K. gave a written statement wherein he indicated that he had tickled the children and blown bubbles on their stomach in the past and may have possibly gone too far.
On June 15, 2007, the children were taken into custody by the State due to an alleged lack of supervision and sexual abuse. In an affidavit in support of the instanter order, OCS relied upon the statements the children made to Tadlock, the results of the "voice stress test," and the statement provided by C.K. Following a continued custody hearing on June 19, 2007, the court found reasonable grounds to believe that the children were in need of care and that continued custody was necessary for the children's safety and protection. The children were eventually moved to foster care.
On September 19, 2007, J.H. and A.H.K. stipulated, without admission, that the children were children in need of care. At the hearing, the court appointed Dr. Margaret Hagan, a licensed psychologist, to perform an evaluation of the parties.
Dr. Hagan, when questioned regarding whether sexual abuse had occurred, testified that "it's very suggestive that it did indeed happen. If it's a yes/no question, [d]id this occur? I'd have to say I don't know. So it would have to be a no." Dr. Hagan, in evaluating C.K., characterized his presentation as "creepy" and found that he lacked sincerity and conviction and was "not believable at all." Dr. Hagan was concerned that C.K. "seems to be attracted to women who have young, infants to toddlers, children. This is not a desired profile in this case." Dr. Hagan testified, however, that if A.H.K. were awarded custody, there would have to be a "guarantee that [C.K.] is never alone with either or both of the children." Dr. Hagan indicated that if she were to make a recommendation, "[C.K.] would be out of the picture...until [the children] reached the age of majority."
On February 28, 2008, A.H.K. and C.K. were divorced. At a subsequent hearing on March 7, 2008, Dr. Hagan indicated that A.H.K. had taken extraordinary measures to make sure that C.K. does not have any access to either her or the children. Ms. Tadlock also testified at the hearing and opined that the children had been abused. Tadlock indicated that although the children's accounts regarding the identity of the perpetrator were inconsistent at first, they later became more consistent when they continued to identify C.K. as the perpetrator. Tadlock's testimony and records also reveal that the children knew more about sexual conduct than was appropriate for their age. Tadlock expressed that her main concern was that the children have no contact with C.K. when visiting their mother and that the mother acknowledge that C.K. was the perpetrator, which would give some assurances that her children would be safe.
Following the hearing, the court ordered that J.H. be given the children during the week and A.H.K. be given the children during the weekend, with approved supervised visitation with A.H.K. during the entirety of the visit. The court further ordered that there was to be absolutely no contact whatsoever between the children and C.K. The court thereafter recessed the matter until April 30.
At the April 30, 2007, hearing, Ms. Tadlock testified that she would like each parent to be involved in weekly therapy with the children. Ms. Tadlock recommended the court not make a final disposition during that time insofar as she wanted to work with the parties in therapy for the next three months. The court ordered the therapy to continue with Ms. Tadlock and removed the supervision requirement during A.H.K.'s visitation.
At the final disposition hearing on August 15, 2008, A.H.K. testified that she believed she took the appropriate steps to protect her children by divorcing C.K. and by getting a restraining order against him. A.H.K. stated that she had had no contact with C.K. when the children were in her presence. She testified that her children believed something happened to them and she believed them "if they believe something happened."
Ms. Tadlock opined that "it is in the best interest of the children ... to have time with both of their parents" and the parents no longer need to be supervised. She also indicated that she believed the family had reached the maximum benefit of what the state has to offer. Similarly, Justine Goebel, the healthcare supervisor for the Washington Parish OCS, indicated that based on the testimony at the dispositional hearing, OCS chose to adopt Ms. Tadlock's suggestion that the parents share joint custody of the children.
Traci Collins, a CASA volunteer appointed in this case, indicated that a joint custody arrangement was in the best interest of the children insofar as both parents have been able to care for the physical and emotional needs of the children and "[t]he children clearly love them, [and] they clearly love the children." However, Ms. Collins opined that a no contact order should remain in effect for C.K. and his family.
Dr. Alicia Pellegrin, an expert in clinical psychology who was retained by A.H.K., indicated that she found parts of the videotape made by J.H. "troubling" and there were deficiencies in the manner in which the children's disclosures came out. Dr. Pellegrin opined that there are so many questions that she does not think that it's possible to ascertain what actually happened.
Following the hearing, the juvenile court ordered the parents to share joint custody of the minor children. The court also ordered that the children were to have no contact with C.K. or C.K.'s mother, J.K.

SCOPE OF APPELLATE REVIEW
A.H.K. and J.H. both filed notices to appeal the juvenile court's ruling. Prior to the appeal being lodged with this court, J.H. died on December 26, 2008.[1] Nonetheless, the appeal was perfected and J.H., through counsel, submitted a brief to this court. A.H.K. has filed a motion to dismiss the appeal of J.H. and to strike J.H.'s brief. The paternal grandparents have also filed a motion to substitute with this court requesting that they be substituted as parties in this appeal in lieu of their deceased son. Subsequently, the paternal grandparents filed a motion to dismiss their action filed with this court.
A.H.K. also requested that this court award sanctions because J.H.'s attorney, in several instances, failed to utilize initials when referencing the parties in briefing this court. However, A.H.K. has filed a motion to dismiss her motion for sanctions and we hereby grant the motion.
We note that parental rights are strictly personal and as such are not heritable. See LSA-C.C.P. art. 428, LSA-C.C. art. 1766, and State in Interest of Minor Female Child, 470 So.2d 595 (La.App. 1 Cir. 1985). The care and custody of a minor child does not devolve as a matter of right to one who is not a parent. Id. at 596. In light of the foregoing, we grant the paternal grandparent's motion and dismiss their motion to substitute. Moreover, because the right to appeal is not heritable, we likewise grant A.H.K.'s motion to dismiss J.H.'s appeal. However, we deny A.H.K.'s motion to strike J.H.'s brief and we will consider J.H.'s arguments that oppose A.H.K.'s position, where appropriate, within A.H.K.'s assignments of error. See State in Interest of S.M., 98-0922, p. 14 (La. 10/12/98), 719 So.2d 445, 452 ("More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive.")
Additionally, we note that A.H.K. filed a writ application with this court, contending that the juvenile court, following J.H.'s death, abused its discretion in awarding visitation to the paternal grandparents. The writ panel referred the writ application to the panel considering this appeal. See 2009 CW 0955 (La.App. 1 Cir. 6/15/09)(Unpublished writ action). However, A.H.K. has instructed this court that subsequent developments in the juvenile court proceedings have rendered the writ application moot. Accordingly, we dismiss the writ application as moot.

ASSIGNMENTS OF ERROR
A.H.K. has raised the following assignments of error:
1. The juvenile court abused its discretion and erred when it altered the custodial judgment of the divorce court (awarding the mother domiciliary custody of the minor children) in the absence of any credible evidence or finding that the mother engaged in any conduct which harmed the children or that the mother failed to take any action to protect the children from harm.
2. The juvenile court abused its discretion and erred when it altered the custodial judgment of the trial court in the absence of any forensically reliable evidence that the children had been sexually molested and in light of the demonstrated gross misconduct by OCS employees.
3. The juvenile court erred when it admitted the hearsay statements of the children as evidence over objection in the absence of a showing that the statements had been obtained in a manner that insured reliability.
4. The juvenile court abused its discretion and erred when it failed to rule on appellant's motion to have her supervised visitation reinstated after it had been terminated by OCS on the grounds that appellant had permitted contact between the children and C.K. during her supervised Christmas 2007 visitation.
5. The juvenile court abused its discretion and denied the mother due process of law when, on July 2, 2007, it announced, sua sponte, that the mother would be limited to 3 hours of testimony to put on her case-in-chief after the case had been pending for over a year, the subject of over 10 separate hearings, and after taking testimony for more than four(4) days in the State's case-in-chief.
6. The juvenile court abused its discretion and erred when it ordered that the children not have any contact with J.K. in the absence of any evidence whatsoever or even an allegation that J.K. had harmed the children, facilitated others in harming the children, failed to take steps to protect the children, etc. or any other basis from which to conclude that contact with J.K. would be harmful to the children.

DISCUSSION
To the extent A.H.K. seeks review of errors that have no effect on the judgment of disposition, specifically including the entirety of assignment of error number four, we note that those issues are moot insofar as we cannot afford A.H.K. any relief in this appeal. In addition to assignments of error numbers one, five and six, the central issue remaining is whether the juvenile court's ruling precluding contact between C.K. and the minor children was manifestly erroneous, and we will review assignments of error numbers two and three within that context.

Joint Custody Agreement (Assignment of Error Number One)
In awarding joint custody, the juvenile court made a determination based on the best interest of the children under the circumstances presented at the final disposition hearing. We note that both A.H.K. and J.H. appealed the juvenile court's ruling to challenge the joint custody award, but J.H. died prior to the record being lodged with this court. We also note that this appeal arises from a child in need of care proceeding. Given the posture in which this matter is before us and the material change in circumstances based on the death of the children's father, we find it more appropriate to remand this case to the juvenile court for a review of the custody arrangement. Accordingly, we remand this matter to the juvenile court for proceedings consistent herewith.

C.K.'s and J.K/s Contact With the Children (Assignments of Error Numbers Two, Three, and Six)
A.H.K. contends that that the juvenile court abused its discretion and erred when it altered the custodial agreement insofar as there was no credible evidence to show that the children had been sexually abused by C.K. A.H.K. avers that all of the allegations in this case were based on various conflicting and inconsistent statements made by the children, mostly to their father. A.H.K. notes that she filed a motion in limine seeking to have the introduction of statements allegedly made by the children to Tadlock concerning the alleged sexual abuse and/or contact excluded absent a showing that the particular statements sought satisfied the requirements set forth in Folse v. Folse, 98-1976 (La. 6/29/99), 738 So.2d 1040. A.H.K. asserts that although hearsay evidence is admissible in Child in Need of Care (CINC) proceedings, it should not be admitted without a showing that it bears a sufficient indicia of reliability based upon particularized guarantees of trustworthiness and is based upon the personal knowledge of the declarant. See also State v. Michaels, 136 NJ. 299, 642 A.2d 1372 (N.J. 1994).[2]
A.H.K. notes that the juvenile court ruled that it would not "accept the hearsay statements] as truth of the matter[s] asserted, but merely for the treatment rendered by this professional." A.H.K. contends that this was error insofar as other statements attributed to the minor children by Tadlock that were subject to independent verification were demonstrated to be false. A.H.K. concludes that the juvenile court should not have accepted the children's statements with regard to alleged sexual abuse for any purpose insofar as there were no sufficient indicia that the statements were reliable.
It is well settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. In re A.J.F., XXXX-XXXX (La. 6/30/00), 764 So.2d 47. In its manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. XXXX-XXXX at p. 26, 764 So.2d at 62. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. Id.; see Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). If the juvenile court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id.; see Pinsonneault v. Merchants & Farmers Bank & Trust Co., 2001-2217, p. 11 (La.4/3/02), 816 So.2d 270, 279.
Even if admission of the children's statements regarding sexual abuse was inappropriate, after considering all of the other admissible testimony and evidence presented in this case, specifically including the testimony of Dr. Hagan and Ms. Tadlock, we cannot conclude that the juvenile court's ruling was manifestly erroneous. Accordingly, we affirm the juvenile court's ruling precluding contact between C.K. and the children.
A.H.K. also contends that the juvenile court abused its discretion when it ordered that C.K.'s mother, J.K., should not have any contact with the children. A.H.K. avers that J.K. was never the subject of the OCS investigation and was never accused of harming or posing any danger to the minor children.
We note that J.K. has no biological ties to these children. And while it is true that J.K. has never been accused of any wrongdoing where the children are concerned, we cannot ignore the fact that J.K. is C.K.'s mother. Under these circumstances, particularly in light of the fact that C.K.'s access to these children has been restricted, we do not find that the juvenile court's ruling extending this restriction of access to the children to C.K.'s mother was unreasonable or not in the best interest of the children, and are unable to say that it was clearly wrong.

Limitation of Testimony at Final Disposition Hearing (Assignment of Error Number Five)
A.H.K. contends that the juvenile court abused its discretion and denied her due process of law when it announced, sua sponte, at the July 2, 2007, hearing, that she would be limited to three hours to present her case-in-chief at the final disposition hearing. No party objected to the trial court's allocation of time at the July 2, 2007, hearing. However, A.H.K. avers that at that time, the juvenile court had informed the parties that no time would be charged on cross examination provided that the party examining the witness on cross did not exceed the time spent by the party calling the witness. A.H.K. notes that at the hearing, however, the juvenile court tracked the time each party asked questions without regard to whether it was on cross or direct. A.H.K. concludes that her time to present her case evaporated as she cross-examined the witnesses presented by the State and by J.H.
The power granted to a court under LSA-C.C.P. art. 1631 to control the proceedings at trial in an "orderly and expeditious manner" is qualified by the requirement imposed by the article "so that justice is done." Further, the due process clauses of the Louisiana Constitution and the Fourteenth Amendment to the United States Constitution guarantee litigants a right to a fair hearing. However, "due process" does not mean litigants are entitled to an unlimited amount of the court's time. Goodwin v. Goodwin, 618 So.2d 579, 583 (La.App. 2 Cir.), writ denied, 623 So.2d 1304 (La. 1993).
In Goodwin, the court noted that with today's overcrowded dockets, some trial judges, seeking to cut down the length of trials in cases pending before them, have imposed time limits on litigants for the presentation of evidence. Id. at 583. The court then adopted the five following non-exclusive factors that should be considered in determining whether the trial court denied a party its due process rights and exceeded the authority granted by statute: (1) before imposing time limitations in a case, the trial judge should be thoroughly familiar, through pretrial proceedings, with the claims of the parties, the proposed testimony and number of witnesses, and the documentary evidence to be presented; (2) if they are used, time limits should be imposed on all parties, before any party presents any evidence, and sufficiently in advance of trial for the litigants to prepare for trial within the limits imposed; (3) the trial judge should inform the parties before the trial begins that reasonable extensions of the time limits will be granted for good cause shown; (4) the trial judge should develop an equitable method of charging time against each litigant's time limits; and (5) the trial judge should put all of his rulings regarding time limits and the reasons for the rulings on the record. Id. at 583-584.[3]
Although the juvenile court did not know the number of witnesses A.H.K. intended to call insofar as no pretrial order had been submitted at the time the ruling was made, the court was nonetheless undoubtedly familiar with the claims of the parties as a result of the numerous prior hearings in this matter. While A.H.K. posits that the juvenile court allowed the State four days of testimony prior to imposing the time limitations, we note that the referenced testimony was elicited at regular review hearings conducted in accord with LSA-Ch.C. art. 692 as opposed to a hearing on the final disposition. At the case review hearings, all parties had the right to testify, to confront and cross-examine adverse witnesses, and the right to present evidence and witnesses. LSA-Ch.C. art. 696. We note that the juvenile court did not limit any party's right to present evidence and witnesses prior to the final disposition hearing. In advance of the dispositional hearing, however, the court indicated that it would allow an additional eight hours, allocating two hours of that time to the State, three hours to J.H., and three hours to A.H.K. Moreover, the juvenile court applied the same rules to all parties for calculating the time. Although the decision to limit testimony was made in chambers, the juvenile court judge put the ruling on the record and explained that he need not hear all the testimony previously given at the prior hearings because it would be unnecessary and duplicative. At the conclusion of the disposition hearing, there is no indication that A.H.K. had utilized the entirety of her time nor did she request additional time to present further testimony. Additionally, following the testimony of her last witness, she indicated that she had nothing further to present to the juvenile court. Accordingly, while we may not have chosen to impose time limits in this case, we cannot conclude the juvenile court abused its discretion in limiting the testimony at the dispositional hearing.

CONCLUSION
For the foregoing reasons, we hereby grant the paternal grandparents' motion to dismiss their motion to substitute, grant A.H.K.'s motion to dismiss J.H.'s appeal, deny A.H.K.'s motion to strike J.H.'s brief, grant A.H.K.'s motion to dismiss her motion for sanctions, and dismiss A.H.K.'s writ application as moot. Moreover, we remand this matter to the juvenile court to consider the joint custody arrangement in light of J.H.'s death, but affirm the judgment in all other respects. Costs of this appeal are to be split between the parties.
AFFIRMED; MATTER REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT HEREWITH. MOTION TO DISMISS MOTION TO SUBSTITUTE GRANTED. MOTION TO DISMISS APPEAL GRANTED. MOTION TO STRIKE BRIEF DENIED. MOTION TO DISMISS MOTION FOR SANCTIONS GRANTED. WRIT DISMISSED AS MOOT.
Downing, J., concurs and assigns reasons
I concur with the majority's opinion. Because the children's father, J.H., is deceased, the trial court's judgment of disposition cannot be implemented and must be modified pursuant to La. Ch.C. art. 716 and attending articles. From this record, we cannot determine the disposition that is most appropriate and in the best interest of the children. La. Ch.C. art. 702. The trial court is in the best position to determine the custody arrangement and conditions that would best protect the children from abuse, whether sole custody be granted to the mother, A.H.K., or whether the paternal grandparents, or anyone else, be given some custody or visitation rights.
NOTES
[1] Although J.H.'s death occurred after the rendition of the juvenile court judgment and no motion to supplement the appellate record with the death certificate has been filed, we nonetheless take judicial notice of this fact. See LSA-C.E. art. 201 and Hill v. East Baton Rouge Parish Dept. of Emergency Med. Servs., 925 So.2d 17, 2 n.1 (La.App. 1 Cir. 12/22/05), 925 So.2d 17, 19 n. 1, writ denied. XXXX-XXXX (La. 5/5/06), 927 So.2d 311.
[2] Therein, the court was concerned that the use of "highly suggestive interrogation techniques" could have distorted the children's recollection of the events. 136 N.J. 299 at 312, 642 A.2d at 1379. The failure to videotape interviews with alleged child victims, the use of blatantly leading questions, and the presence of an interviewer with a preconceived idea of what the child should be disclosing, in addition to the children's susceptibility to suggestive questioning, all indicate the potential for the elicitation of unreliable information. 136 N.J. 299 at 312, 642 A.2d 1372 at 1378, citing Idaho v. Wright, 497 U.S. 805, 812-13, 110 S.Ct. 3139, 3145, 111 L.Ed.2d 638, 650 (1990).
[3] This Court, in an unpublished opinion, adopted the five factor analysis utilized by the Goodwin court. See Kinney v. Bourgeois, 2006-2384 (La.App. 1 Cir. 9/14/07), 962 So.2d 1234 (table), writ denied, 2007-2026 (La. 1/7/08), 973 So.2d 730.